Slip Op. 14 - 144

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Court No. 11-00109 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| VINH HOAN CORPORATION, VINH | : | |
| QUANG FISHERIES CORPORATION, | : | |
| H&N FOODS INTERNATIONAL, and | : | |
| VIETNAM ASSOCIATION OF SEAFOOD | : | |
| EXPORTERS AND PRODUCERS | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

## OPINION

[Sustaining remand results on sixth antidumping duty administrative review of frozen fish fillets from the Socialist Republic of Vietnam.]

Decided: December 18, 2014

*Valerie A. Slater*, *Jarrod M. Goldfeder*, *Nazakhtar Nikakhtar*, and *Nicole M. D'Avanzo*, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington DC, for the plaintiffs.

*Ryan M. Majerus*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, argued for the defendant. On the brief were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel was *David W. Richardson*, Attorney-International, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Matthew J. McConkey* and *Jeffrey C. Lowe*, Mayer Brown LLP, of Washington DC, for defendant-intervenor Vinh Hoan Corporation.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific, PLLC, of Washington DC, for defendant-intervenors Vinh Quang Fisheries Corporation and H&N Foods International.

*Mark E. Pardo* and *Andrew T. Schutz*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington DC, for defendant-intervenor Vietnam Association of Seafood Exporters and Producers.

Musgrave, Senior Judge:  This opinion considers the results of redetermination ("*Redetermination*" or "RR") of *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Sixth Antidumping Duty Administrative Review and Sixth New Shipper Review*, 76 Fed. Reg. 15941 (Mar. 22, 2011), PDoc 246 ("*Sixth Review*") from the International Trade Administration, United States Department of Commerce ("Commerce"). *See generally* Slip Op. 13-63 (May 23, 2013).  The plaintiffs, Catfish Farmers of America, *et alia*, petitioners in the administrative proceeding, argue for further remand on several grounds.  On different grounds, the defendant-intervenors, Vinh Hoan Corporation, *et alia*, respondents before Commerce, also argue for further remand.  For the following reasons, however, the *Redetermination* will be sustained.

## I. *Background*

As previously described, the primary dispute is over Commerce's surrogate valuation ("SV") of the respondents' factors of production ("FOPs").[1]  *See* 19 U.S.C. §1677b(c)(1).  The

---

[1]  As previously discussed, Commerce must use "the best available information" from the appropriate market-economy country to value FOPs.  19 U.S.C. §1677b(c)(1).  In selecting the appropriate SV, Commerce considers whether it is: (1) publicly available, (2) contemporaneous with the period of review ("POR"), (3) represents a broad market average, (4) chosen from an approved surrogate country, (5) is tax and duty-exclusive, and (6) specific to the input.  *See, e.g.*, RR at 4, referencing *First Administrative Review of Sodium Hexametaphosphate from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review*, 75 Fed. Reg. 64695 (Oct. 20, 2010), and accompanying issues and decision memorandum ("IDM") at cmt. 3.  Commerce explained that these considerations are not hierarchical and that the "best" available SV information
(continued...)

analysis of the record's information thereon as a whole was remanded for reconsideration and/or clarification. In the *Redetermination*, Commerce's surrogate country selection again resolved to analysis of the information available for Bangladesh versus the Philippines. The dispute here continues to focus upon the extent to which the Bangladesh Department of Agricultural Marketing ("DAM") data and the Philippine Bureau of Aquaculture Statistics ("BAS") data satisfy the "broad market average" and "specificity" SV factors.

Commerce had also requested remand to address an omission regarding an allegation of subsidies for Gemini Sea Food, upon whose Bangladeshi financial data Commerce had relied, as well as reconsideration of the SV for fish waste. For the fish waste, the *Sixth Review* had relied upon import statistics for the Philippines as opposed to specific price quotes from Vitarich Corporation, a Philippine fish and seafood processor. In addition, SVs for broken meat and fish skins were also remanded, since the Vitarich quote was bound to those analyses as well.

With respect to specific questions previously posed by the court, on remand Commerce vacated its prior finding that the Philippine BAS data were unsuitable due to alleged data volatility, vacated its prior finding that alleged differences in BAS prices rendered the Philippine

---

[1] (...continued)
for each input is a product- and case-specific determination. *Id.*, referencing *Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 Fed. Reg. 40477 (July 17, 2006), and accompanying IDM at cmt. 1; *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19546 (Apr. 22, 2002), and accompanying IDM at cmt. 2. The parties do not dispute the underlying determinations in the *Sixth Review* that Bangladesh and the Philippines are economically comparable and significant producers of comparable merchandise, and it is further undisputed that the Philippine BAS data and the Bangladeshi DAM data satisfy factors (1), (2), (4) and (5). Commerce thus continued to find that both sources are publicly available, contemporaneous with the POR, from an approved surrogate country, and tax and duty exclusive.

source unsuitable, and accounted for changes in inventory in the surrogate financial ratio calculations

of data for Fine Foods Ltd., a Bangladeshi integrated processor of seafood.  Regarding the SV for

the whole fish FOP, Commerce also continued to consider both the Philippines' BAS and

Bangladesh's DAM data to represent "official statements" of those governments as to the price of

whole live fish relevant to surrogate country selection.

Considering the BAS data in isolation, Commerce again observed that they covered

various seafood products of 81 provinces, represented sampling selected from both top-producing

provinces and less significant-producing provinces, represented a grand total of 47.14 MTs of

*Pangasius* production for two full years, *i.e.*, 0.08 percent of Bangladeshi production for a single year

and less than 0.001 percent of total Philippine aquaculture production.  RR at 5.  Commerce also

noted that the Philippines Secretary of Agriculture described the Philippines *Pangasius* industry, in

a letter submitted one year and four months after the POR, as being provided extensive support,

having high production costs, limited in production and sales, and still in its incipient stage and

considered an infant industry.  *Id*. at 5-6.  Commerce also concluded from the BAS survey forms that

the *Pangasius* industry is not well-established, as *Pangasius* is not one of the types of fish listed on

the forms and must be written in separately.  *Id.* at 6.

In the end, although Commerce "do[es] not question the validity of the BAS sampling

methodology as a whole", and the question being whether the data source represents the best

information available for SV purposes given the information of record, Commerce identified as an

"underlying problem" that there is no explanation on the record on how the BAS filled apparent

"gaps" in the data.[2]  Commerce thus concluded unclear the degree to which the estimated total *Pangasius* production figures provided in the BAS data are a reliable indicator of the country's production in this instance, and therefore determined that the BAS data for *Pangasius* do not represent a broad market average suitable for SV purposes.  *Id*.

Considering the DAM data, through juxtaposition against the BAS data, Commerce found them to represent a broad market because they are "a fuller set" than the BAS data and reliable because they were "collected using a scientific method".  Specifically, Commerce found the DAM data a "fuller set" than the BAS data because (a) the DAM data were collected using direct weekly price observations, from each district, covering the exact POR, whereas the BAS data are extrapolated estimates of total production, (b) *Pangasius* data were a category specifically collected by DAM whereas the BAS data relied on users to input "*Pangasius*" under a general "Other" category, and (c) the DAM data contained data points for 91.43 percent of Bangladesh's districts (64 out of 67 districts) covering 2,828 weekly price reports during the precise period of the POR, whereas the BAS coverage was more geographically limited.  *Id*. at 8.

Addressing the issues raised in the prior opinion, Commerce provided (1) elaboration on past cases in which Commerce faced similar factual circumstances, where, despite its preference

---

[2]  Commerce observed that in terms of methodology, the BAS national estimates rely on the previous year's data, of which there are none for *Pangasius* in the majority of the provinces in 2008.  For example, the production figure in 2008 for the Isabela province was 3.51 MT, but according to Commerce's interpretation of the BAS methodology, this estimate was based on "inflating" the 2007 Isabela "production estimate."  That estimate was zero.  None of the provinces reported *Pangasius* production in 2007, so the BAS could not have relied on another province's production as a proxy; therefore, Commerce found it unclear exactly how the BAS inflated the 2007 "zero" production to produce the 2008 estimated production levels for all the provinces or inflated to produce the 2009 estimated production levels for five of the eight provinces covered by such data.  RR at 6-7.

for data containing volume and value information, it used data to value major inputs absent such information (such as the DAM data here); (2) clarification of how the data would be representative of commercial quantities of whole fish sales; (3) consideration of the size of the DAM data as a factor as well as its prior statement that the Philippine sampling methodology does not provide statistically equivalent representation in comparison; and (4) consideration of the plaintiffs' contention that there is no record evidence that links the DAM data and the *Fisheries Statistical Yearbook* of Bangladesh (relied upon to demonstrate the size of Bangladesh's *Pangasius* production) or any other basis for assuming that the DAM 2008-09 data cover more sales or quantities than the Philippine national statistics; and (5) consideration of the affidavits submitted by the plaintiffs concerning DAM's price data collection methodology.

On the first three points, above, Commerce found the lack of quantity information associated with the DAM data insignificant after analogizing the situation to the Indian JPC data for steel wire rod data used in *Nail*s and *Hangers*[3] (*i.e.*, price data with no underlying values or volumes) and after finding the DAM price data represent "systematic, national-level price monitoring" that is specific to the same *Pangasius* species at issue and collected by a government agency and maintained on a regular basis.  *Id.* at 8-9.  Given that whole live *Pangasius* fish are a highly perishable product, and also given the scope, coverage, and frequency of collection of the DAM data, Commerce reasoned that the DAM data do not represent insignificant quantities when considered alongside the fact that the *Pangasius* market totaled 59,474 MTs during this period.  *Id.* at 9.

---

[3] *Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33977 (June 16, 2008) (final LTFV determination), and accompanying IDM (June 6, 2008); *Steel Wire Garment Hangers from the People's Republic of China*, 73 Fed. Reg. 47587 (Aug. 14, 2008) (final LTFV determination), and accompanying IDM (Aug. 7, 2008).

Regarding the argument of a lack of a direct link between the DAM data and the *Fisheries Statistical Yearbook* of Bangladesh, Commerce found that data do not have to be all from the same source to provide useful, reliable government-generated information, and that the lack of direct linkage is unsurprising since the Government of Bangladesh collected them for different purposes -- one to report on weekly market prices, and the other to report on overall annual country-wide production. *Id*. at 9. Commerce thus reasoned that the DAM data represent a fuller set of data and thus a broad market average as compared to the BAS data, because the DAM data as a whole represent national-level governmental-price monitoring/reporting and cover numerous commodities for the POR, one of which was specifically the *Pangasius* fish species at issue, and because corresponding national production data from the same government for nearly the exact same period show overall production of 59,474 MTs, which is "more than enough to supply any Respondents' production requirements." *Id*. Moreover, Commerce reasoned, Bangladeshi *Pangasius* production represents 6.52% of total national aquaculture production, the fifth largest overall among all products, and its *Pangasius* industry became "well established" after 1998. *Id*.

Lastly, on the three affidavits submitted by the plaintiffs concerning the DAM data for the *Sixth Review*, Commerce determined that even according them "weight," the statements on the letters from Bangladeshi officials are "more reliable," as they appear on official letterhead and were "given as part of performing in their official capacity". *Id*. at 10. Thus, Commerce determined, from "the totality of the above evidence," that the DAM data satisfy the broad market average requirement "to a significantly greater degree" than the BAS data, and after "further evaluating" the

record evidence as a whole, Commerce determined, again, that Bangladesh is the best surrogate

country option for the SV of the respondents' FOPs.  *Id*.  *See also id*. at 17.

Commerce also determined to select different SVs for the broken meat, fish skin, and

fish waste by-products,[4] RR at 18-19, and it found the presence of a "cash subsidy" in Gemini's

financial statements insufficient to render them unsuitable for the purpose of calculating the

surrogate financial ratios, *id*. at 19-21.

Commerce claims it thus accounted for all of the changes in the margin calculations

and addressed the issues raised on remand with respect to the ministerial error allegations.  The

resulting antidumping margin for respondent Vinh Hoan Corporation ("Vinh Hoan") was $0.06 per

kilogram, which would also be the margin for those companies not individually examined but

---

[4] Regarding the prior opinion's observation with respect to the contribution of different FOPs to the margin calculation, by way of further background for purposes of this opinion Commerce explains in the *Redetermination* that the SV for whole fish dominates the decision of which surrogate country to select, given its overwhelming contribution to the cost of manufacturing and normal value ("NV").  RR at 3.  Respondents in this POR overwhelmingly purchased whole live fish as opposed to farming it themselves, and therefore Commerce determined that purchased whole live fish are more important relative to other FOPs, of which Commerce generally considered the surrogate financial ratios to be a more important component of the margin calculation.  *Id*.  Commerce further explains that it generally prefers to average multiple usable financial statements where available and that Bangladesh has three usable financial statements versus the single one for the Philippines.  *Id*.  Thus, while the SV data for some secondary FOPs are more contemporaneous in the Philippines than the corresponding Bangladeshi data, Commerce did not place significant weight on that fact when rendering its overall decision on the surrogate country especially since it can inflate these values to make them current with the POR to mitigate against the non-contemporaneity of certain data.  *Id*.  Given all this, Commerce summarizes, the surrogate financial ratios are a more important component of the margin calculation for this POR than a "handful" of secondary FOPs that contribute minimally to the overall NV.  *Id*.  In addressing the plaintiffs' comments, Commerce rejected their argument that the value of the by-products should be added to the secondary non-fish FOP values before comparing the latter to NV to determine the percentage of these secondary FOPs of the NV on the ground that this addition would artificially skew the secondary FOP percentage upward because the NV has already been reduced by the amount of the by-product offset, *id*. at 25-26, and the plaintiffs do not contest this determination here.

receiving a separate rate if the results of redetermination are sustained and amended final results are

issued.  For the voluntary respondent Vinh Quang Fisheries Corporation ("Vinh Quang") and the

new shipper review respondent Cuu Long Fish Joint Stock Company (''CL-Fish''), the margins were

*de minimis*.

## II.  *Discussion*

### A.  Incorporation By Reference

As an initial matter, the defendant objects to the plaintiffs' attempt to incorporate by

reference its 88-page administrative comments on the draft *Redetermination* as an improper attempt

to exceed the page limitation for filing comments on remand results.[5]  The court agrees to an extent.

The court's page limitation on briefs is not an invitation to incorporate by reference, and it is not the

function of the court to develop the parties' arguments.  Nonetheless, the administrative briefs are

still part of "the record," and as such the court has a duty to examine them, for any necessary

clarification, or concerning the extent of the fullness of that development.  Arguments not

specifically raised therein will either be disregarded or limited to the extent of their development.

---

[5]  Def's Resp. at 2-3, referencing *United States v. Great American Insurance Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("[i]t is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived") (citation omitted); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1579, 1578, 659 F. Supp. 2d 1303, 1308 (2009) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" as "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones'"), quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *JBF RAK LLC v. United States*, 38 CIT ___, ___, 961 F. Supp. 2d 1274, 1283 (2014) ("[t]he court would in essence be litigating the issue for Plaintiff, something the court cannot do").

### B.  DAM Data Public Availability Determination

The plaintiffs contest Commerce's public availability determination on the DAM data embodied by the worksheets of record.  Commerce found the same or similar worksheets not publicly available during the subsequent seventh administrative review[6] because DAM did not respond to Commerce's repeated requests for information regarding how the DAM data is made available to the public and there was evidence of the plaintiffs' failed attempt(s) at collecting the purported public data directly from the relevant Bangladeshi government ministry.  *See Seventh Review* at cmt. I.C.  The plaintiffs attempted to submit that information for the record at bar, *see* Pets' Subm. dated Nov. 27, 2013, Rem. PDoc 9, which Commerce rejected on the ground that it contained unsolicited new factual information.  Commerce Letter Rejecting Pets' Subm. dated Nov. 27, 2013, Rem. PDoc 10.[7]  Quoting *Anshan Iron & Steel Co. v. United States*, 28 CIT 1728, 1736-37, 358 F. Supp. 2d 1236, 1243 (2004) for the proposition that  "[e]vidence cannot be substantial if Commerce is aware that the conclusion it supports is false", the plaintiffs urge the court to consider that Commerce was undoubtedly aware of the subsequent seventh review determination while it was undertaking the *Redetermination*.  Pls' Cmts at 7.

Pertinent to that proposition, however, the plaintiffs' interpretation of the more recent case of *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) is unpersuasive.  Referencing *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir.

---

[6] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 77 Fed. Reg. 15039 (Mar. 14, 2012), and accompanying IDM (Mar. 7, 2012) ("*Seventh Review*").

[7]  Commerce retained a copy of the rejected information in the administrative record and provided the plaintiffs the opportunity to resubmit with the identified data redacted, which the plaintiffs did.  *See* Pets' Admin. Cmts on the Draft Rem. dated Dec. 12, 2013, Rem. PDoc11.

1990), *Essar* affirms the general rule that in the absence of fraud or other such limited exception,[8] the finality attaching to an administrative determination must be respected, including the administrative record upon which the determination rests.  In light thereof, the court is not persuaded that Commerce's public-availability determination during remand on the DAM worksheets was incorrect as a matter of substantial evidence or law involved abuse of discretion in the rejection of the plaintiff's attempted submission of information from the *Seventh Review* as "new" factual matter. Although the administrative record consists of "a copy of all information *presented to* or obtained by [Commerce] during the course of the administrative proceeding", 19 U.S.C. §1516a(b)(2)(A)(i) (italics added), Commerce's consideration extended only to pertinent factual information of record in deciding "that the letters from Bangladeshi officials, appearing on official letterhead and given as part of performing in their official capacity, are more reliable than affidavits that the plaintiffs procured for the specific purpose of being used in an antidumping duty proceeding" and that there was nothing on the record to "undermine[ ] their public availability".  RR at 27.  In other words, notwithstanding what Commerce "knew" or may have learned from its administration of the *Seventh Review*, its decision not to permit supplementation of the record with such information (or, rather,

---

[8]  In *Borlem*, the court held that the International Trade Commission ("ITC") should reopen the record to reconsider its injury determination because of a Commerce-amended, less-than-fair-value ("LTFV") determination that changed a respondent's margin from affirmative to *de minimis*. 913 F.2d at 937.  The LTFV determination, upon which the ITC relied when making its affirmative threat of injury determination, was found to be incorrect, and the ITC issued an amended determination.  *Id*. The court identified that this change could have affected the ITC's injury determination, rendering it negative and, as a result, eliminating the possibility of the antidumping duty order.  *Id*. at 937.  *See also Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1379 (Fed. Cir. 2011) (addressing potential impact of fraud discovered in subsequent review upon prior completed, "final" review).

decline to consider such record-supplementation) was not improper.  *See Essar*.  Substantial

evidence therefore supports Commerce's DAM data public availability redetermination.

C. "Broad Market Average" Finding

1.  DAM Data

          The plaintiffs contend Commerce's finding that the DAM data provide a broad

market average is erroneous.  They argue: that Commerce's emphasis on the "individual data points"

within the DAM worksheets ignores the prior opinion's concerns on data set "fullness" and results

in an unreasonable inference of a broad market average in the absence of any sales quantity

information in the worksheets; that Commerce's characterization of the DAM data, as representing

"weekly commercial quantities", RR at 32, is without factual support; that their "Hassan" affidavit

refutes that the DAM data were "representative of [market] prices" and self-validating prior to

publication; that Commerce did not address the other affidavits from Bangladeshi aquafarmers they

submitted for the record; that Commerce's distinction of *Laizou Auto Brake Equipment Co. v. United*

*States*, 32 CIT 711 (2008) and *Jinan Yipin Corp. Ltd. v. United States*, 35 CIT ___, 800 F. Supp. 2d

1226 (2011) and its analogy to *Nails* and *Hangers*, *supra*, for the proposition that the worksheets are

reliable is inapposite; and that the statement of the DAM official the respondents obtained for the

SV record, and upon which the agency relied, is the same statement that Commerce discredited in

the *Seventh Review*.

          On the last point, *see supra*, part "B".  The defendant also contends that Commerce's

determination that the DAM data represented a "fuller" data set than the BAS data is based on the

fact that the DAM data represented 2,828 weekly price observations from 64 of 67 Bangladeshi

districts that covered the period of review under examination, as compared with BAS data consisting of "only" 8 of 81 Philippine provinces at best that were extrapolated into estimates of total production. The defendant contends the fact that data for "*Pangasius*" were specifically included in the DAM data collection sheets but not specifically included in the BAS data, which relied upon a respondent's volunteering of "*Pangasius*" data under the BAS questionnaire's "other" category, bolsters Commerce's conclusion. And regarding the plaintiffs' critique of Commerce's analysis of *Laizou Auto*, *Jinan Yipin*, *Nails*, and *Hangers*, and the *Redetermination*'s factual distinction thereof, the defendant argues that although evidence of industry use of a government data set may provide "additional support" for the reliability of the government data, its absence does not undermine the general "reliability" of "government statistics," and thus, given such reliability, the absence of quantity data is not a concern. Def's Resp. at 12. The defendant also argues the DAM data's 2,828 price points from 64 of the 67 Bangladeshi districts each represent "at least" 100 kilograms of *Pangasius* and provide an average price that is generally "free of the reliability concerns" that exist where there is a single price from a single sale, such that the quantity could "dramatically" affect the price, and thus quantity "is not as much of a concern as it would be with a single price." *Id.*

Continuing with regard to the argument that the DAM worksheets lack any commercial quantities associated with them, the defendant argues that Vinh Hoan processes at least 244 metric tons of fish a day, and thus it is reasonable to assume that they are buying whole live fish wholesale in greater than 100 kilogram lots. Further, the defendant argues that Commerce on remand implicitly relied on the fact that "there is a minimum quantity associated with the DAM

data" because the weekly price points are "per quintal" (*i.e.*, 100 kilograms)[9] in order to calculate

the minimum amount the DAM data could represent, namely 282.8 metric tons of *Pangasius* fish

for one year (*i.e.*, approximately six times the total of 47 metric tons of *Pangasius* for two years of

BAS data), and that "282.8 metric tons is an extraordinarily conservative figure given that other

record evidence indicates that annual Bangladeshi production of [*P*]*angasius* is nearly 60,000 metric

tons and that the respondents' typical wholesale purchases exceed this 100 kilogram weight by a

large margin in metric ton units."[10] *Id.* at 9-10 (italics added), referencing, *inter alia*, RR at 5, 8, 31.

Lastly, regarding Commerce's consideration of the three affidavits the plaintiffs

submitted for the record and the plaintiffs' argument that Commerce did not give enough weight to

the Bangladeshi lawyer's affidavit or "address the farmers' affidavits at all", Pls' Cmts at 13, the

defendant counters that Commerce specifically addressed each of these affidavits in the

---

[9]   *See* RR at 31; *see also* Vietnam Association of Seafood Exporters and Producers ("VASEP")'s Subm. at Exs 7A and 7B (dated Nov. 12, 2010), PDoc 195, fr. 530.

[10]   The government also points out that at the very least the DAM data represent 282 metric tons of *Pangasius* fish for the relevant, one-year period of review and that Vin Hoan processes at least 244 metric tons of fish per day, while the BAS data represents only 47 metric tons over a two-year period, and that the purchasers of whole live fish are processors who purchase whole live fish in lots larger than 100 kilograms, not in 5 kilogram quantities. *See* Def's Resp. at 10 & n.3, referencing Vinh Hoan's January 6, 2010 Section D Questionnaire Response, at Ex. 10, PDoc 70. Although such record evidence cannot be overlooked, the government's arguments overstates the *Redetermination*, in which Commerce made no minimum quantity finding but rather stated that the DAM data do not represent insignificant quantities, and only stated that Bangladesh produced "more than enough" metric tons of *Pangasius* "to supply any Respondent's production requirements." *Id.* at 8, 9.  The *Redetermination* will not be sustained upon a ground that Commerce itself did not articulate. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50 (1983).  At a minimum, it is rather the fact that the DAM data represent wholesale datapoints of 100-kilogram lots -- over and above the plaintiffs' hypothetical 5-kilogram sales -- that speaks for itself in "establishing that the price data consist of bulk business-to-business lots/transaction prices." RR at 31.

*Redetermination*,[11] and that the role of the court here is not to re-weigh the evidence but rather determine if the agency's determination is supported by substantial record evidence and otherwise in accordance with law. *E.g.*, *NSK Ltd. v. United States*, 481 F.3d 1355, 1359 (Fed. Cir. 2007). The defendant contends Commerce simply gave more weight to the representations of an official of the Bangladeshi government, written on official letterhead and given in that person's official capacity, than an affidavit from a non-Bangladeshi official,[12] and in discussing the two Bangladeshi farmer affidavits Commerce simply found the fact that a particular farmer's price is higher than the average price was insufficient to undermine the validity of the purported average.

Considering the foregoing, the court is not persuaded by the plaintiffs' arguments that Commerce's broad market average finding with respect to the DAM data is not supported by substantial evidence or not in accordance with law, for the reasons stated by the defendant.

2. BAS Data

The plaintiffs also contest Commerce's determination that the BAS does not constitute a broad market average. That determination was made after consideration of the letter from the Philippine Secretary of Agriculture, the scope of the BAS survey forms, and the BAS data

---

[11]  Def's Resp. at 14, referencing RR at 9-10, 31, 37-38.

[12]  The defendant gratuitously adds here: ". . . that was procured solely for the purposes of the antidumping duty proceeding". Def's Resp. at 15 (citation omitted). The same might just as well be said of the "official statements" regarding the DAM worksheets procured on behalf of the defendant-intervenors. However, the defendant adds, "[w]hen government statistics are based on a regularly maintained, updated, and systematic national level data collection system, it is reasonable to presume that they are reliable and representative of the data they represent, in the absence of evidence to the contrary." *Id*. at 12. The court can agree such a presumption is reasonable to the extent of statistics' regular maintenance, but not, emphatically, by virtue of the fact that they are governmental.

collection methods.  RR at 32-35.  The plaintiffs argue that the determination conflicts with the

determinations in the preceding and subsequent reviews[13] as well as the original determination, that

the "nascency" of the Philippines *Pangasius* industry is a specious reason for not finding the BAS

data a broad market average, that the "broadly established" market criterion expressed in the

*Redetermination* is unlawful, that the absence of a specified "*Pangasius*" category in the BAS data

survey form does not render actual the BAS data any less reliable, and that Commerce erred in

finding that "gaps" exist in the BAS data  *See* Pls' Cmts at 14-24.

     a. Consistency with Other Determinations

       As described more fully in the subsections that follow, there is some merit in the

plaintiffs' argument of inconsistency between the agency's BAS redetermination on remand of the

*Sixth Review* versus the relevant determination in the *Fifth Review*.  The defendant contends each

administrative review is subject to judicial review based on the facts on the discrete record

underlying the challenged proceeding.[14]  While the court does not adjudge the reasonableness of the

*Redetermination* on the basis of the agency's determination in a subsequent proceeding, it will,

however, consider the reasoning of prior proceedings when considering the reasonableness of a

present determination, as the "general rule that an agency must either conform itself to its prior

decisions or explain the reasons for its departure." *Citrosuco Paulista, S.A. v. United States*, 12 CIT

---

    [13]  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 12726 (Mar. 17, 2010) ("*Fifth Review*"), and accompanying IDM (Mar. 10, 2010) at cmt. 1; *Seventh Review* IDM at cmt. I.C.

    [14]  *See, e.g.*, *Vinh Quang Fisheries Corp. v. United States*, 33 CIT 1277, 1283, 637 F. Supp. 2d 1352, 1358 (2009); *China Processed Food Import & Export Co. v. United States*, 33 CIT 405, 411 n.2, 614 F. Supp. 2d 1337, 1344 n.2 (2009).

1196, 1209, 704 F. Supp. 1075 (1988) (the rule "is not designed to restrict an agency's consideration of the facts from one case to the next" but "to insure consistency in an agency's administration of a statute"). The defendant contends that without a demonstration that the facts are "identical" in each separate segment, the fact that different decisions were reached in different segments of the proceeding does not indicate that the conclusion reached in the instant case was erroneous, but the defendant's interpretation is too restrictive. *See*, *e.g.*, *I&D Memo* at 12 ("two recent antidumping duty investigations. . . cited to others involving *similar* fact patterns") (italics added); *Jiaxing Brother Fastener Co. v. United States*, 38 CIT ___, ___, 11 F. Supp. 3d 1326, 1330 (2014) ("as Commerce explains, the record and circumstances of this administrative review are not so *similar* to *Wire Hangers* as to require the same result") (italics added in part).

     b.  Relevance of Age and Size of Philippine *Pangasius* Industry

        Commerce speculates that the "nascent" Philippine *Pangasius* industry may have different economies of scale than other, more mature aquaculture industries.  In a similar vein, Commerce contends the newness and the small size of the Philippines' *Pangasius* industry is directly relevant and probative of whether the BAS data are representative of "broadly established" commercial *Pangasius* production.

        Proceeding from a proposition of general knowledge of market "nascency" may not be not unreasonable *per se*, but the analysis must take into account whatever in the record fairly detracts therefrom.  The defendant admits that Commerce made no finding that there were extraordinary or aberrational start-up costs, but it insinuates that must have been the case. *See* Def's Resp. at 17.  Given the contrary evidence of record the plaintiffs submitted, however, such

speculation does not provide logical support for concluding that the BAS data do not represent a "broad market average," *i.e.*, do not represent a substantial portion of the market for *Pangasius* in the Philippines, or that these prices are not reflective of the national Philippine market for that product.[15]  *See Jacobi Carbons AB v. United States*, 38 CIT ___, ___, 992 F. Supp. 2d 1360, 1369 (2014), *appeals filed*, *inter alia*, No. 14-1753 (Fed. Cir. Aug. 26, 2014).  Commerce does not adequately explain in this instance how the relative newness of the Philippine *Pangasius* industry renders the prices published in the BAS unreliable as a surrogate for valuing respondents' whole fish inputs in Vietnam.  The defendant argues that when faced with a choice between a well-established and a nascent industry, the well-established industry "better reflects" the "typical" costs of producing the product in Vietnam, and that Bangladesh is in fact one of a small number of countries with an "established" *Pangasius* industry, but that argument puts the cart before the horse on whether the BAS data can be determined representative of a "broad market average" in its own right.  Whether the Bangladesh market is broad-*er* is different matter.

Further on this point, the court agrees with the plaintiffs that Commerce's focus on the nascency and size of the Philippine *Pangasius* market introduced criteria not encompassed by the straightforward term "broad market average", *i.e.*, an average that is representative of the particular market under consideration as a whole.  *See Jacobi*, *supra.*  Apart from being unexplained, "broadly established" appears to be employed in the *Redetermination*, *see* RR at 33, to connote a fundamentally different and more restrictive meaning, concerning which application the parties

---

[15]  The plaintiffs also object to the implication in the *Redetermination* that they "share" the position that the Philippine *Pangasius* industry is "small".  Pls' Cmts at 15 n.8, referencing RR at 33 and Pets' Cmts at 32-33.  Duly noted.

should have had the opportunity to comment in advance, since new standards may not be applied *ad hoc* without providing an opportunity for parties to provide argument and evidence relating to them.[16] And if "broadly established" equates to "broad market average," the employment thereof does not adequately explain why the BAS data, purportedly representative of *Pangasius* production in the Philippines based on collection methodology intended to cover 81 provinces and cities,[17] are not representative of a substantial portion of "the market" for *Pangasius* in that country or reflective of the national Philippine market for *Pangasius hypophthalmus*. *See Jacobi*, *supra*.

    c. Absence of "*Pangasius*" Category on BAS Survey Forms

        The defendant states that "the fact that *Pangasius* is one of the less significant species produced in the Philippines[ ] *is the reason* that the BAS's form does not list it separately" and that the absence of a specific field for "*Pangasius*" on the BAS survey form therefore calls into question

---

[16] *See, e.g.*, *British Steel plc v. United States*, 19 CIT 176, 255-56, 879 F. Supp. 1254, 1316-17 (1995); *Sigma Corp. v. United States*, 17 CIT 1288, 1304-05, 841 F. Supp. 1255, 1267-68 (1993). Similarly, Commerce states in footnote 82 of the *Redetermination* with regard to the Bangladeshi farmer affidavits the plaintiffs submitted that if (italics added)

> they were to be relied upon, the production quantities from a mere two Bangladeshi *Pangasius* farmers for one calendar year dwarf the total *Pangasius* production amount for two full years in the BAS data. This point further highlights the fact that the *Pangasius* industry in the Philippines is not *economically significant* enough to produce price data that represent a broad market average, even if such price data were collected by a government agency using a statistically sound methodology.

Commerce here presumes a certain but unspecified level of economic activity in what constitutes a "broad market average", whereas the normal understanding of that term is the *extent* of a market's coverage provided by the average data, for example the indices provided by Dow Jones or Standard and Poor's. "The market" for consideration "is what it is," to use the vernacular, and if in the above observation Commerce intended to impose a different interpretation of "broad market average," then Commerce should have so clarified for the benefit of interested parties and provided opportunity for comment.

[17] *See* Pets' SV Subm. (Nov. 12, 2010) ("Pets' SV2"), at Ex. 1, iii-iv, PDoc 196.

"the systematic nature of the [BAS's] collection system, as there are no assurances that *Pangasius*

production information was specifically requested." RR at 34 (italics added).  Whether the first point

is true, the court cannot agree that this second "finding" (assuming it to be such) was reasonable.

        The plaintiffs point out that the information of record shows trained data collectors

responsible to BAS for working with the surveyed farmers to ensure that the questionnaires covered

"all" species of fish farmed.  Pets' SV Subm. (July 9, 2010) ("Pets' SV1") at attach. 1, PDoc 132.

The record indicates that BAS does not send questionnaires to respondents but rather that these

trained data collectors visit aquafarmers or aquafarm operators and work with those queried to fill

out the survey form.  *See id*. at attach. 1, Viloria Affidavit, ¶12.  Nothing of record indicates to the

contrary.  The plaintiffs also aver that the entire "*raison d'etre* of the BAS is to compile and publish

data for agriculture and fisheries that represent production volumes and values country wide",  Pls'

Cmts at 23, referencing Pets' SV3 at Ex. 7 (BAS mission statement), PDoc 210, and the record again

evinces no contraindication of that not being the case.  Hence, it appears erroneous to imply that

surveyed farmers are left to fend for themselves in figuring out how to fill out the forms, and without

knowing how to report their *Pangasius* price data (as inclusive or exclusive of transportation costs)

as the defendant suggests.  In other words, when that portion of the record is considered as a whole,[18]

the court fails to understand why the fact that the BAS's forms collect *Pangasius* data under an

---

[18]  The plaintiffs also point out that the statement of the Chief of the BAS Fisheries Statistics
Division who oversaw the collection and presentation of the fisheries statistics explains that "[d]ata
collection is done through personal interviews of respondents using structured questionnaires." Pets'
SV1 at attach. 1, PDoc 132.  Although that may appear speculative, as it is subject to interpretation,
the plaintiffs also point out that the  "Explanatory Text" of the BAS data indicates that the BAS
conducts surveys regularly, on a "quarterly" basis, to collect data on volume and value for "cultured
species by environment, by type of aquafarm, by region and by province," and that this data is
routinely checked for errors prior to publication.  *See* Pets' SV2 at Ex. 1, p. iii-iv, PDoc 196.

"others" category provides a basis for impugning the quality of the *Pangasius* data collected, *see also infra*, or a basis for concluding the nature of BAS's data collection is not systemic.  Furthermore, the defendant has not undertaken a comparable analysis with respect to the DAM data, which the plaintiffs argue would be impossible given the absence of information concerning the DAM's data collection procedures and/or survey forms related to the DAM worksheets.  The defendant argues that there is a demonstrable difference in the collection of the *Pangasius*-specific data, but neither it nor Commerce elaborates on that proposition in the context of this issue,[19] and the court will not speculate as to a different basis for concluding that the BAS data do not represent a "broad market average" than as expressed in the *Redetermination*.

     d. "Gaps" in the BAS Data

         The parties also dispute whether it may reasonably be concluded that there were any statistically relevant "gaps" in the BAS data.  On this point, the *Redetermination* begins curiously:

> We do not question the validity of the BAS sampling methodology as a whole.  Rather, the question is whether this data source represents the best information available for SV purposes given all of the information on the record. . . .

RR at 6.  Actually, the question to be answered at *this* stage of the proceeding was simply whether the BAS data represent a broad market average, not whether they represent the "best information available" for SV purposes "given all of the information on the record".  Be that as it may, the *Redetermination* claims several reasons, although they appear to reduce to one, as to "why the sampling would not produce a reliable and valid result", to wit:

> In terms of methodology, the BAS national estimates rely on previous year's data,[ ] of which there are none for *Pangasius* in the majority of the provinces in 2008.  For

---

[19] *But see* next subsection, *infra*.

example, the production figure in 2008 for the Isabela province was 3.51 MT.[ ]
However, according to the BAS methodology, this estimate was based on inflating
the 2007 Isabela production estimate, which was zero.  Moreover, none of the
provinces reported *Pangasius* production in 2007, so the BAS could not have relied
on another province's production as a proxy.  Therefore, it is unclear exactly how the
BAS inflated the 2007 "zero" production to produce 2008 estimated production for
all the provinces.  This same issue also applies to five of the eight provinces for the
2009 estimated production figures.[ ]  The underlying problem is that there is no
explanation on the record on how the BAS filled these gaps in the data.  In other
words, there are too many gaps in the BAS methodology that are not explained by
record evidence.  Thus, even though the underlying methodology may indeed be
valid, using this methodology on an infant/nascent industry is problematic, given that
there will be a very small response rate for *Pangasius* within the overall sample size,
and there will be a number of respondents within the sample reporting nothing for
*Pangasius* at all.  Put another way, the methodology relies on sampling to produce
its estimated totals, and *if* there are numerous gaps in responses from those who are
sampled, it makes the final reported number less dependable.  It is, thus, unclear to
what degree the estimated total *Pangasius* production figures provided in the BAS
data are a reliable indicator of the country's production in this instance.  Therefore,
a further reading and close examination of the information on the record, as
expressed by the above analysis, demonstrates that the BAS data for *Pangasius* do
not represent a broad market average suitable for surrogate valuation purposes.

RR at 6-7 (citations omitted; italics added).  *See also id*. at 34-35.

The plaintiffs argue that this allegation of "gaps" in the BAS data is premised on an

incorrect reading of the statistical survey method described in the BAS's "Aquaculture Production:

Estimation and/or Compilation Procedure", and the erroneous conclusion that the BAS's *Pangasius*

data for 2008 and 2009 were "based on the previous year's estimates," as well as on the assumption

that due to certain provinces not reporting *Pangasius* production volumes in 2007 the production

volumes reported in 2008 for those provinces are necessarily distorted.  *See id*. at 6, 34-35.  During

the *Sixth Review* proceeding the plaintiffs argued to Commerce: (a) that the "Explanatory Text"

accompanying the BAS publication states that in 2008 the BAS surveyed aquaculture farms using

a "stratified" random sampling technique which is described in the "Aquaculture Production Survey"

form;[20] (b) that the survey is intended to cover production of 1,994 aquaculture farms from 81

Philippine provinces and cities; and (c) that the data collected from this survey formed the basis of

the BAS's production volume and value figures published in 2008.   The plaintiffs contend the

defendant has incorrectly assumed that the BAS used its Quarterly Aquaculture Survey ("QAS")

method to estimate *Pangasius* production and volumes in 2008, whereas the record shows that the

BAS only uses its QAS methods to estimate aquaculture production volume and values in those

years in which it does not obtain aquaculture production statistics using the "stratified" sampling

technique.   They contend 2008 was not one of those years, but a year in which the BAS "used the

more expansive stratified sampling methodology to collect production data country wide".[21]   Pls'

Cmts at 22, referencing Pets' SV2 at Ex. 1, iii-iv (in 2008, "aquafarms were stratified according to

area [and  s]imple random sampling was employed in the selection of sample aquafarms from each

stratum"), PDoc 196.

_____

[20]   *See* Pets' SV1 at attach. 1, PDoc 132; Pets' SV2 at Ex. 1, iii-iv, PDoc 196; Pets' SV
Subm. (Dec. 13, 2010) ("Pets' SV3") at Ex. 8 (2.2.1.3.C Aquaculture Production: Estimation and/or
Compilation Procedure), PDoc 210.   The plaintiffs also argue that despite the defendant's apparent
conclusion to the contrary, RR at 35, they referenced this form correctly in their comments on the
agency's draft *Redetermination* because it was the form used by the BAS to collect *Pangasius* data
in 2008 since the form pertains to data collected through stratified random sampling.   *See infra*.

[21]   *See* Pets' SV2 at Ex. 1, at iii-iv, PDoc 196 (explaining the use of "quarterly surveys" when
stratified sampling is not performed). The plaintiffs contend that in the intervening years, the BAS
collects quarterly statistics on aquaculture production and values using statistically valid sampling
of the aquaculture farming population. *Id*.   The BAS then compares its quarterly aquaculture data
to the prior year's data to determine whether production volumes and prices have grown or decreased
during the survey year as compared to the prior year. *Id*.; Pets' SV3 at Ex. 8 (2.2.1.3.C Aquaculture
Production: Estimation and/or Compilation Procedure), PDoc 210, Pl. App. 19.   Using this
comparison, the BAS adjusts (inflates or deflates) the prior year's production volume and values to
estimate the current year's production.

Thus, the plaintiffs aver, the BAS's published figures for 2008 were not derived from 2007 production volumes as Commerce assumed.  Similarly, they further aver, the 2009 BAS published aquaculture statistics (including *Pangasius* data) are based on data covering a total of 1994 farms (or "operators") via sampling thereof.  *Id*.  The year 2008 was a year in which the QAS methodology was used to extrapolate production volume and value data, the plaintiffs contend, and there is no otherwise valid basis to question the reliability of the survey methodology, used by the BAS to estimate *Pangasius* production volumes and values in QAS-methodology years, in order to infer that "gaps" exist in the BAS data, since, as mentioned, the entire "*raison d'etre* of the BAS is to compile and publish data for agriculture and fisheries that represent production volumes and values country wide."  *Id.* at 23, referencing Pets' SV3 at Ex. 7 (BAS mission statement), PDoc 210.[22]

Thus, the plaintiffs continue, the record "makes clear" that the BAS takes "great care" to ensure the accuracy of the statistics it publishes, and the defendant has provided no credible explanation as to how the BAS methodology is now unsound especially when that same

---

[22]  For example, the plaintiffs continue, the Chief of the BAS Fisheries Statistics Division explained that the BAS data collectors gather actual production data each quarter, through the use of QAS forms, to ensure that the data collected are up to date.  Pls' Cmts at 23, referencing Pets' SV1 at attach. 1, PDoc 132, and Pets' SV3 at Ex. 7, PDoc 201.  Further, the "Explanatory Text" of the BAS underscores the reliability of the survey techniques it uses by noting that the quarterly data is collected methodically and systematically, the data collection procedures account for "changes" in aquaculture production factors (such as "opening or closure of farms and operations of new landing centers"), and the data is routinely reviewed to "ascertain the accuracy of the data gathered."  Pets' SV2 at Ex. 1, p. iii-iv, PDoc 196.  According to the BAS, after aquaculture data is collected, "analyzed and validated," the "estimates of production [are] generated."  *Id*., p. iv.

methodology did not undermine a broad market average finding in the preceding review.[23]  Pls' Cmts

at 23, referencing *Fifth Review*, IDM at cmt. 1.A.  They argue Commerce cannot reasonably

conclude that "gaps" exist in the BAS's methodology when it had six months during remand to fill

any supposed gaps.  *Id*. at 24.  And they also note that while Commerce devotes much time and

effort to dismissing the BAS methodology, Commerce continues to "sidestep" the fact that the record

contains virtually no information about the methodology that the DAM used to compile its wholesale

prices.  *Id*.  The plaintiffs point to Commerce's statement that it "cannot simply draw a negative

inference about th[at] fact, given that Bangladeshi officials have attested to its completeness and

reliability", *id*., quoting RR at 35, and they argue Commerce is here applying a double standard with

respect to the  BAS data as its basis for rejecting them when Commerce applied no similar analysis

with respect to the DAM data.

            The court finds that Commerce could not reasonably conclude the existence of actual

"gaps" in the BAS data and it has not sufficiently explained why such gaps should reasonably be

presumed and be preclusive of determining the BAS data a "broad market average."  To cut to the

chase: the parties' dispute appear to center on whether the 2008 BAS data are based on more or less

"expansive" data collection methodology, involving stratified random sampling and/or quarterly

surveys,[24] with the defendant's papers essentially maintaining that the plaintiffs have not shown that

---

[23]  The plaintiffs also argue that if Commerce harbored concerns about the nature of the
BAS's sampling methodology or the manner by which it compiled, reviewed, and published its data,
it could have sought clarification from the BAS directly, especially given the fact that the prior
opinion gave Commerce "discretion to reopen [the] record" if needed to gather additional
information.  Slip Op. 13-63 at 34.

[24]  The defendant points to BAS's description of its stratified random sampling methodology
(continued...)

the record demonstrates BAS used "more expansive" methodology during 2008.   That point,

however, does not demonstrate that even if 2008 was a year in which BAS "reduce[d] the number

of sample farms and sample[d] less often", Def's Resp at 21, such methodology would necessarily

not have provided a statistically valid presentation of the population of Philippine *Pangasius*

production.  The argument rather appears concerned with the magnitude of the margins of error that

would be encompassed by BAS's sampling technique.

        The defendant also criticizes that there is no record evidence "linking" *Pangasius*

production to the number (1,994) of Philippine farm operators, or evidence that BAS "surveyed"

---

[24] (...continued)

on its website as using the aquafarm as the sampling unit, stratifying freshwater fishponds by culture system (mono- or poly-), stratifying brackishwater fishponds by management system (intensity and extensity), stratifying fishpens and fishcages, and using random sampling in the selection of aquafarms from each stratum, involving "at times when there are limited resources" selection of "five/three sample aquafarms . . . from each top five/three producing municipalities identified as sample municipalities in the province" with a maximum of 25 sample aquafarms allocated for each major producing province, nine (9) for minor provinces, and three (3) sample aquafarms for "very minor" provinces.  Def's Resp. at 20, referencing VASEP's Subm., at Ex. 1B (Country STAT: Aquaculture Surveys: Sampling Design/Statistical unit/Selection Procedure, dated Dec. 13, 2010), Pub. Doc. 209.  The defendant further points out that according to the affidavit of BAS's Chief of Fisheries Statistic Division,

> [t]he volume and value data for *Pangasius* in the attached schedule, entitled "Freshwater Fishpond, 2008," is the complete and final compiled information collected for *Pangasius* produced in the Philippines for the year 2008. This report forms part of the Bureau's working papers and contains the statistical data used to prepare the official *Fisheries Statistics of the Philippines* and the *Fisheries Situationer* publications. Information is collected/gathered on a quarterly basis specifically during the last two weeks of the last month of each quarter, *i.e.* March, June, September and December.

*Id*. at 21, referencing Pets' SV1, attach. 1, PDoc 132. The defendant further notes that the BAS also advises that "[w]hen operations were constrained by insufficient financial resources, the Bureau undertook every other day data collection with reduced sample sizes and/or quarterly surveys with reduced sample sizes and with key informants as respondents."  *Id*., referencing Pets' SV2, Ex. 1, BAS Explanatory Text, at page iv ("C. Sample Sizes"), PDoc 196.

*Pangasius* farm operators in all 81 provinces and cities in 2009.  The first point appears to involve

application of another double standard, *cf.* RR at 9 ("we find that [DAM] data do not have to be all

from the exact same source to provide useful, reliable government-generated information"), and the

second point disregards the whole point of sampling without impugning the BAS methodology.  The

defendant further criticizes that "the small volume of the BAS data" and the fact that it "is based on

extrapolations from only four Philippine provinces out of 81 in 2008 and eight provinces out of 81

in 2009", but again these points do not adequately discredit or explain why, on that basis, the BAS

data may not properly be concluded statistically representative of a substantial portion of the market

for *Pangasius* in the Philippines or statistically reflective of prices for the national Philippine market

for that product.  *See Jacobi*.

       In sum, the reasons Commerce offers for finding the BAS data do not constitute a

broad market average are insufficiently supported with substantial evidence of record.

D.  "Specificity" (<i>i.e.</i>, Level of Trade)

       In accordance with slip opinion 13-63, on remand Commerce clarified that the

"specificity" issue in this matter is concerned with arguments regarding differences in the level of

trade of the reported prices, *i.e.*, farm-gate versus wholesale.  The *Redetermination* notes that the

process of constructing NV for a producer in an NME country using SVs is difficult and necessarily

imprecise, and that while Commerce strives to select the best SV possible, it is not necessary for it

to duplicate the exact production experience of the NME producers at the expense of choosing an

SV that "most accurately" represents the input in question, given all of the evidence on the record.

RR at 36, referencing *Nation Ford Chemical Co. v. United States*, 166 F.3d. 1373, 1377 (Fed. Cir. 1999) & *Nation Ford Chemical Co. v. United States*, 21 CIT 1371, 985 F. Supp. 133 (1997).

The plaintiffs maintain that throughout the administrative proceeding and litigation the use of farm-gate prices has been considered of major importance because the record reflects that the respondents obtained their whole-fish input directly from aquaculture farms, and that it was precisely because of the importance placed upon farm-gate pricing in prior reviews that the plaintiffs sought data that would reflect that pricing. *See*, *e.g.*, Pls' 56.2 Mot. Br. at 24-36.   In the *Redetermination*, Commerce considered the parties' arguments and focused its examination upon whether the record showed quantifiable distinctions between the farm-gate BAS pricing data and the wholesale DAM pricing data, and also in light of footnote 8 of slip opinion 13-63.

As an initial matter, Commerce disavows that it expressed a preference for farm-gate prices *per se* in the *Fifth Review*, taking the position here that it seeks prices that are tax- and duty-exclusive, whatever else they may be. *See Redetermination* at 12-13 ("it is the extent to which any price, whether called 'farm-gate' or 'wholesale'[,] includes taxes, duties or other expenses that Commerce considers in comparing sources (if such a comparison is possible)").   This retrenchment appears somewhat at odds with the goal of finding the "best information" that can replicate a respondent's production experience (and in this proceeding it is uncontested that respondents procured whole live fish from fish farms) as well as the inference of Commerce's previous articulation. *See Fifth Review*, IDM at cmt. I.C.: "it is unclear whether the Pangas Thesis' methodology relies on farm-gate prices or market prices, *and if market prices, what movement or other expenses are included in those prices*" (italics added).   Nonetheless, Commerce's explanation

is not unreasonable, as the *Redetermination* further clarifies that adjustments can equilibrate differences in levels of trade, *see infra*, and for a difference in levels of trade to have any meaning in a dumping calculation, record evidence must establish that there are actual differences in costs associated with the alleged different levels of trade. *Cf.* 19 C.F.R. §351.412(a). For purposes of this proceeding, Commerce therefore performed what it describes as a conservative, hypothetical, and additional freight calculation that overstated the wholesale freight cost.[25] RR at 16, 33-35; *see also* Draft Results BPI Memo., dated Nov. 15, 2013, Remand CDoc. 9. The evidence of record showed an insignificant level-of-trade distinction for purposes of the margin calculation between BAS "farm gate" prices and DAM "wholesale" prices.

Substantial evidence supports finding no *quantifiable* level of trade distinction between BAS and DAM data for purposes of this proceeding, but it would be unreasonable to restrict

---

[25]  As a proxy for the actual Bangladeshi distance between farms and wholesale markets, Commerce used the distance from the fish farms where respondents in the administrative proceeding sourced their fish input to their processing facilities, together with the Bangladeshi freight SV, in order to conclude that the transportation charges associated were "miniscule", by which Commerce apparently means less than $0.01 per kilogram. *See* RR at 38. Commerce noted that since the SV for the *Pangasius* fish input is multiplied by each respondent's FOP usage rate, the $0.01 per kilogram difference is in fact "even greater" than the "miniscule" amount of the transportation costs associated with the whole live fish input, but in relation to another issue discussed in the *Redetermination* (at pages 42-43), the plaintiffs had asserted that a difference of $0.01 per kilogram in the SV for the primary material input would have no meaningful effect on Commerce's margin calculations. Acknowledging that the plaintiffs had averred that transportation charges are not the only difference between farm-gate and wholesale prices, Commerce found that they had failed to define or specify any others, while at the same time positing that farm-gate prices can be either higher or lower, such that any other difference could be positive or negative, with transportation being the only constant difference, and therefore Commerce reasoned that by dismissing a $0.01 per kilogram difference as being immaterial, the plaintiffs had essentially conceded that the potential difference in a price between the wholesale and farm-gate levels that can be approximated using record evidence is even more immaterial, as the available record evidence showed that it does not lead to any meaningful difference in the SV of the primary input, and by extension, the overall margin calculation.

the analysis of the BAM and DAM data only to such a basis, as the plaintiffs' emphasis is with

respect to the inconceivability of the DAM data estimates as consisting of wholesale prices of whole

*live* fish, and similar such qualitative factors must also be considered.   Commerce apparently found

no such qualitative distinctions, however.   *See I&D Memo* at 10, referencing VASEP's November

12, 2010, submission at Ex. 7b ("the wholesale price of Pangas in this country-wide government

database is with reference to the price of whole *live* unprocessed Pangas, sold into the marketplace")

(italics added).   *See also id.* at 8 (considering the fact that whole live Pangasius fish are a highly

perishable product).   Regardless of the treatment the DAM worksheet data (and the official

statements or non-responses pertinent thereto) merited in the subsequent seventh review, the court

must find that the referenced support amounts to more than a mere scintilla in support of

Commerce's *Redetermination*, and the court's function here does not involve re-weighing the

evidence of record.

E.  Consideration of the Totality of Available Evidence

As mentioned, Commerce determined that the DAM data satisfy the broad market

average requirement "to a significantly greater degree" than the BAS data and that the specificity

requirement was ambivalent as between the two sets.  After "further evaluating" the record evidence

as a whole, Commerce again determined that the DAM data were the best for the whole fish SV and

that Bangladesh offered the best SV option for the respondents' FOPs. The plaintiffs commented to

Commerce that its draft analysis of which of the potential surrogate countries offers the best

available whole live fish prices is misleading because the non-fish FOPs and financial ratios are

significant. Commerce disagreed, finding that the relative insignificance of the value of non-fish

FOPs can be shown by comparing them to the overall NV, which reflects a significant reduction for the by-product offset, and by this method non-fish FOPs "represent a small percentage of NV". RR at 25-26.

The plaintiffs here argue Commerce's approach "significantly skews" the analysis because by-products are non-fish FOPs for which surrogate values must be selected, so comparing non-fish FOPs to an NV that has already been reduced to reflect the by-product offset results in a significant understatement of the importance of non-fish FOPs. The plaintiffs argued it would be more accurate to aggregate the respondents' costs of secondary materials, energy inputs, labor, and packing inputs plus the value of their by-products, and then compare the value of these elements to the total value of all elements included in the NV, so that the analysis properly accounts for the percentage that all non-fish inputs and financial ratio factors, including by-products, represent of NV, and when this analysis is "correctly performed," the record reveals that all non-fish FOPs and surrogate financial ratios "comprise a substantial portion of the total value of all elements included in the NV calculation." Pls' Cmts at 37, referencing Pets' Cmts at 75. The plaintiffs also call attention to the fact that Commerce relied upon a Philippine source rather than a Bangladeshi source to value by-products in the *Redetermination*. *See* RR at 18-19.

The court is not, however, positioned to conclude that the plaintiffs' preferred analysis would necessarily yield a "more accurate" result as opposed to simply being a different method of analyzing the same data. In calculating NV, Commerce stated that it had already adjusted it for the by-product offset so that "adding the by-product value back into the final comparison would actually result in an inaccurate doubling of the amount of by-product value in relation to the other

components of the calculation."  RR at 26.  Commerce's conclusion that non-fish FOPS are third

in importance behind the whole live fish FOP and financial ratios, and its conclusion that the non-

fish-FOPS-to-NV ratio is "small", do not appear explicitly or implicitly unreasonable, and the

plaintiffs' argument does not otherwise undermine Commerce's consideration.

   The plaintiffs also contend Commerce is effectively stating that the Bangladeshi and

Philippine financial statements are equivalents, since Commerce now states that they all reflect

production of "comparable merchandise."  RR at 26-27.  The plaintiffs argue substantial record

evidence shows that the Philippine companies produce *Pangasius* (RDEX) and finfish (Bluefin),

which means that at least one of the Philippine companies produces identical, not comparable,

merchandise, whereas the Bangladesh companies are all shrimp producers.  *See* Pets' Cmts at 77.

At a minimum, they argue, Commerce should have found that the Philippine producers' financial

data are "more comparable" to the Vietnamese respondents (which are producers of *Pangasius*, a

fin fish) than producers of shrimp products.  Regardless, however, Commerce found the production

processes for fish fillets versus frozen shrimp "quite similar", RR at 26-27, and the court is not free

to disagree with the substantiality of evidence in support thereof. Further, in considering the

contribution of different FOPs to the margin calculation, Commerce posited that "the surrogate

financial ratios are generally a more important component", and it reiterated that it "generally prefers

to average multiple usable financial statements where available".  RR at 3.  That is undisputed, and

in the final analysis, it appears numerosity simply trumped the points the plaintiff raised above:

"Because the DAM data are the best available information on the record to value the whole live fish,

and we have three usable financial statements from Bangladesh, we continue to find that Bangladesh

is the best choice for the primary surrogate country." RR at 25. The defendant thus reiterates that three provides a better average than one or two, and with that proposition, the court is not yet positioned to disagree, contrary to the plaintiffs' argument thereon.

F.  Alleged Subsidy in Gemini's Financial Statements

The plaintiffs' allegation of a potentially countervailable subsidy in the financial statements for "Gemini," a Bangladeshi seafood company upon which Commerce had relied to calculate surrogate financial ratios but purporting a "cash subsidy,"[26] had not been addressed in the *Sixth Review I&D Memo* and was remanded voluntarily. On remand, Commerce found each of the plaintiffs' arguments thereon unsupported by data on the record. In particular, Commerce found that the bank circular mentioned in Gemini's financial statements was not the same as the bank circular that the plaintiffs submitted on the record. Commerce also considered "several other subsidy programs allegedly available" that the plaintiffs had mentioned "in passing" but found " no evidence at all that Gemini received benefits from any of these programs in 2008-[2]009, or any other period, as there is absolutely no reference to any of them anywhere in its financial statements." RR at 20-21.

The plaintiffs dispute that they did not provide a copy of the very bank circular mentioned in the financial statement, but in the end that matters not, because upon examination thereof Commerce found that the terms of the alleged subsidy demonstrated that the bank circular program terminated before the end of the POR. RR at 39. The plaintiffs also argue that the

---

[26] Gemini's 2008-09 financial statements report that "[a]s per Bangladesh Bank circular no. FE-23 dated 12-12-2003 total cash subsidy assessed against export for the year is Tk. 9,99,79,199.00", and it also characterizes the subsidy as a "10% Cash Subsidy as per Bangladesh Bank Circular No. FE-23 dated 12/12/03 against export bills." Pets' SV Subm. (Apr. 8, 2010) at Ex. 26-B, PDoc 96.

program's termination before the POR is immaterial because a government study demonstrates that the Bangladeshi government generally provided export subsidies on frozen shrimp, and that record evidence demonstrates that but for the receipt of this declared cash subsidy Gemini would have reported a "massive" overall loss and Commerce's policy is not to use zero profit companies in its surrogate financial ratio calculation.[27]  *See* Pls' Cmts at 40.  However, the court finds these arguments are barred on grounds of exhaustion since the plaintiffs did not raise them in commenting on the draft remand results, and none of the doctrine's exceptions appears applicable.[28]  Substantial evidence of record otherwise supports Commerce's determinations on this issue.

### G.  SVs for Fish Waste, Broken Meat, and Fish Skin

In the underlying review, Commerce selected Philippine HTS category 0304.90 (other fish meat of marine fish) to value the fish waste, broken meat, and fish skin by-products after rejecting the Philippine and Indian price quotes submitted by the plaintiffs.  Commerce then requested voluntary remand regarding the SV for fish waste.  In granting that request, the SV

---

[27]  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 29473 (June 22, 2009), and accompanying IDM (June 15, 2009) at cmt. 1.A (explaining Commerce's preferred practice is to "use the financial statements of companies that have earned a profit and disregard the financial statements of companies that have zero profit when there are other financial statements that have earned positive profit on the record"); *see also Catfish Farmers of America v. United States*, 33 CIT 1258, 1275, 641 F. Supp. 2d 1362, 1378 (2009).

[28]  The court "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping determinations, 28 U.S.C. §2637(d) and it is well-settled that the "reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."  *Gerber Food (Yunnan) Co. Ltd. v. United States*, 33 CIT 186, 195, 601 F. Supp. 2d 1370, 1379 (2009), quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946).

selection for broken meat and fish skin was also remanded as it appeared to be intertwined with that of fish waste, given that the plaintiffs had proffered the same alternative source for both.

Commerce explained that when it endeavors to find appropriate SVs for by-products it attempts to find identical items to those produced by respondents.  In this instance, it found that the closest import statistics on the record were from a basket category of Harmonized Tariff Schedule classification that contains many other things besides waste, broken meat, and fish skin. As previously mentioned, the record also contains price quotes from the Philippine Vitarich company for a variety of *Pangasius* fish waste products, including head and belly waste, fat and intestines, bone and tails waste, and skin and trimmings.  These encompass the three by-products at issue here.

After reviewing the information on the record and considering its approach in recent determinations and other aquaculture cases, Commerce found that seafood by-products are generally not internationally traded commodities that would be reflected in import statistics, and it also found that the HTS description in question is for fish meat rather than by-products.  Thus, Commerce reasoned that valuing fish waste using import statistics would result in a fish waste SV that was higher than that of the whole fish and that such an SV would distort the NV calculation.  Commerce also found specificity to be an important factor in valuing the by-products at issue.  Commerce further found that the Vitarich price quote satisfies the criteria of public availability, terms of payment, and tax and duty exclusivity, and that the Vitarich quote's "far superior specificity" and the fact that it meets the other SV selection criteria including temporality outweighs the broad market average criterion.  Commerce found the Vitarich quotes, dated April 2010, "not so far outside the POR as to be unusable" after deflating the relevant SVs to make them contemporaneous with the

POR.  RR at 19 n.46, referencing *Hebei Metals & Minerals Import & Export Corp. v. United States*, 29 CIT 288, 301, 366 F. Supp. 2d 1264, 1275 (2005) (contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the POR).  Commerce also rejected an Indian price quote from the record, as it pertained to only one by-product (fish waste), and, although dated closer to the POR, was unclear if the price is tax/duty exclusive.

Vinh Hoan urges further remand for reconsideration of this decision, arguing that the Vitarich quote is an unsuitable surrogate value source, that price quotes generally must be carefully scrutinized to determine if they represent a reliable market price prior to use,[29] that the circumstances of how this price quote was obtained (through a Philippine attorney) and what the quotes actually represent (*e.g.*, "trimmings", "pickup price", *etc.*) leave "unresolved" issues that should have raised doubts before Commerce regarding the Vitarich quote's reliability, that Commerce rejected the same price quote in the *Seventh Review*,[30] that Commerce's finding "that seafood by-products are generally not internationally traded commodities which would be reflected in import statistics" is simply untrue,[31] that Commerce provides no explanation for how a higher value for a by-product distorts the NV calculation, and "as a general matter, it is quite possible that a by-product which undergoes further processing could have a higher value than the input product".  Def-Int's Cmts at 9.

---

[29]  Def-Int's Cmts at 6, referencing *Synthetic Indigo from the People's Republic of China*, 68 Fed. Reg. 53711 (Sep. 12, 2003) (final admin. review) and accompanying IDM at 5.

[30]  *See Seventh Review*, 77 Fed. Reg. 15039, IDM at 18 (citations omitted).  *But see* rejection of similar argument with respect to Commerce's DAM data public availability determination, *supra*.

[31]  Def-Int's Cmts at 9, referencing Vinh Hoan Section D QR at Ex. 24 (Jan. 6, 2010) (showing sales of by-products to foreign markets), CDoc 17.

        The court cannot conclude Commerce's determination to use the Vitarich quotes unreasonable.  Commerce explains that it does not usually prefer to use price quotes as surrogate values, but in this case it found the specificity of the price quote to the three by-products Commerce needed to value to be an important factor in their valuation for the reasons above summarized.  *See* RR at 18.  Vinh Hoan argues that Commerce has not addressed all of the flaws it found in the Vitarich data in the original determination and that those flaws must result in a finding to the effect that the Vitarich price quotes are not acceptable surrogate values for the three fish by-products at issue.  Def-Int's Cmts at 7.  But Commerce addressed most of the deficiencies in the Vitarich data in the *Redetermination*, RR at 42-43, *see also* Def-Int's Cmts at 6-7, and it acknowledges that there are still flaws with the price quotes just as there are flaws in the HTS data.  It decided, rather, after weighing the evidence and given the fact that the surrogate value originally used resulted in values that made the fish by-products more valuable than the whole live fish, that the best available evidence was the Vitarich quotes because they were much more specific to the by-products being valued than the overly broad HTS basket category originally relied upon.  In addressing each of Vinh Hoan's arguments, Commerce provided a detailed, adequate explanation in the *Redetermination* as to why that is the case in this instance.  Vinh Hoan does not appear to dispute Commerce's finding that the Vitarich quote is more specific than the alternative HTS category, which includes fish meat of marine fish, or the finding that the HTS data values for "other fish meat of marine fish" was greater than the value for whole live fish, which, since it includes the fillets, should be more valuable than just the by-products. Vinh Hoan argued that further processed by-products can achieve a higher value than the input, but there is no record evidence that the SVs at issue here represented further

processed by-products.  Vinh Hoan also took issue with Commerce's observation that seafood by-products are not internationally traded and thus not reflected in import statistics, but Commerce stressed that it was "generally" the case that seafood by-products are not a product of international commerce without further-advance processing, while the defendant adds that "[t]he lack of such HTS data is a good indication that the by-products are not generally internationally traded." Def's Resp. at 34, referencing RR at 43.  Vinh Hoan's argument does not extend to resolving the absence of specific HTS data on the record from which these by-products could be valued.  RR at 43. Substantial evidence therefore supports Commerce's determination.

H.  Ministerial Error Allegations and Effect on Margins

Four issues pertaining to calculations involving the categorization of certain items in the financial ratio calculations for Apex, Gemini, and Fine Foods were also remanded.  Commerce was requested: (1) to address not accounting for Apex and Gemini's changes in finished goods inventory as no amended final results were issued; (2) to explain the effect Apex's and Gemini's corrections in addition to the specific corrections for Vinh Hoan would have on the margins, as they were close to *de minimis* and it was unclear whether the corrections may have material impact; (3) to address why for Fine Foods Commerce found the nature of the allegation to be methodological, when Commerce put Fine Foods' ratio calculation on the record in the *Sixth Review* and the parties' apparent avenue to raise this claim was through the ministerial error process; and (4) to explain the use of facts available ("FA") and accounting with respect to the classification of apparent changes in Fine Foods' inventories as the record therefor was unclear.

For the *Redetemermination*, Commerce made corrections in its computer program with respect to Apex and Gemini's ratio calculations and corrected ministerial error after considering Vinh Hoan's specific allegation thereon.   Neither the margins nor the assessment rates for any company changed and, accordingly, Commerce did not publish amendment of the *Sixth Review*. These corrections are reflected in the programs used in these remand results.

Regarding the appropriate time at which to raise arguments concerning the changes in inventory for Fine Foods, Commerce noted in the *Redetermination* that even though parties intended their submission of the relevant financial statements to be used for valuing whole live fish, they were placed on the record well before the preliminary results, Fine Foods was identified as a fish processor in the financial statements, and the parties were thereby alerted that the financial statements could be used for surrogate ratio valuation purposes. Thus, Commerce's position is that the parties had ample time to comment on the classification of any line items.  Further, irrespective of the timing of when to raise arguments, Commerce also noted that it did address the parties' arguments regarding Fine Food's changes in inventory by stating that "Fine Foods' financial statements lack sufficient detail to determine the proper treatment of the changes in inventory."  RR at 23 (citation omitted)

After further review on remand of the financial line items for Fine Foods of "Opening Stock/Inventories" and "Closing Stock/Inventories", Commerce found that the financial statements did in fact contain the detail necessary to account for change in inventory.  Specifically, Commerce found the total inventory values (identified in Fine Foods' financial statements as either related to fish or fingerlings in the Inventory section thereof) tie to the inventories in the cost of goods sold.

Commerce found that Fine Foods both farms fish and engages in fish processing, and that along with processed fillets both fish and fingerlings can be sold in their own right as finished products. Commerce, therefore, determined that the inventory changes presented in Fine Foods' financial statement should be considered as changes in the finished goods inventory, and Commerce revised the calculation of financial ratios to reflect this. *Id*. at 45-46.

Vinh Hoan urges further reconsideration of Commerce's decision to include changes in inventory from Fine Foods' financial statement in the financial ratio calculations, arguing that Commerce has not adequately explained its change in position concerning the amount of detail provided in the Fine Food financial statements to account for inventory changes, and that because there is no evidence that Fine Foods sold any fingerlings it would not be considered a "finished good" that would need to be accounted for in the finished goods inventory. Def-Int's Cmts at 11.

The court, however, cannot find the extent of Commerce's explanation inadequate, and substantial evidence supports determining from Fine Foods' financial statements that Fine Foods sold fingerlings. *See* Pets' Aug. 16, 2010 Subm., attach. 1 (Fine Foods financial statement), PDoc 154. It was therefore not unreasonable for Commerce to find upon remand that the inventory figures that include fingerlings were included in the cost of goods sold. *See id.* at 23, 27. Commerce thereby and therefore appropriately accounted for that matter in the inventory figures.

Vinh Hoan also argues that the inventory value data in the Fine Foods financial statement were prepared by Fine Foods' management and not by the company's auditors such that the auditors declined to comment on the valuation of the assets. Def-Int's Cmts at 11. However, that

argument does not appear to the court sufficient to undermine Fine Foods' financial statement or the auditors' comments thereon with respect to the accuracy of the data in the financial statement.

## III.  *Conclusion*

In accordance with the court's prior order and based on analysis of the four issues Commerce was instructed to reconsider as well as interested parties' comments thereto, Commerce has maintained its selection of Bangladesh as the primary country, has selected different SVs for the fish waste, broken meat, and fish skin by-products using information from the Vitarich price quote, has continued to use Gemini's financial statements to calculate the surrogate financial ratios, has accounted for all calculation changes as a result of the original ministerial error allegations, and has addressed the issues raised in the prior opinion regarding Fine Foods' financial statements. Margin calculation changes resulted from selecting different by-product SVs and adjusting for the inventory changes in Fine Foods' financial statements.  Accounting for all such changes and issues, the *Redetermination*'s resulting antidumping margin for respondent Vinh Hoan is $0.06 per kilogram, while the margins for the voluntary respondent Vinh Quang and the new shipper review respondent CL-Fish are *de minimis*. Vinh Hoan's margin, being above *de minimis*, becomes the margin for those companies not individually examined but receiving a separate rate assuming this decision is rendered final after all appeals.

Based upon the opinion above, the results of remand will be sustained.  Judgment to that effect is issued herewith.

**So ordered**.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated:  December 18, 2014
         New York, New York